In the Matter of the Application of LOUIS CALDER, Petitioner, for an Order Pursuant to Article 78 of the Civil Practice Act against MARK GRAVES and Others, Constituting the State Tax Commission of the State of New York, Respondents.

Third Department, January 8, 1941.

*Seth T. Cole,* for the petitioner.

*John J. Bennett, Jr., Attorney-General* [*Joseph M. Mesnig, Assistant Attorney-General,* of counsel], for the respondents.

FOSTER, J. This is a proceeding in the nature of certiorari to review a final determination of the State Tax Commission which affirmed additional personal income tax assessments against petitioner for the years 1931 to 1935, inclusive. For these years petitioner filed personal income tax returns with the State Tax Commission pursuant to article 16 of the Tax Law as a resident of the State of New York. After investigation respondents caused additional taxes to be assessed against petitioner upon such returns. Petitioner then applied for a recomputation and revision of the additional assessments under section 374 of the Tax Law, at least for the years 1931, 1934 and 1935. There seems to be some question

as to whether proper applications for revision were made as to the years 1932 and 1933, but if there was such omission in fact no point is made of it for our consideration, and we shall accordingly consider the whole period. Hearings were held before the Commission at which testimony was taken. Roughly stated the question presented was whether certain sums of money received by petitioner from a corporation, of which he owned all the common stock, were dividends, or loans as petitioner contended. In view of the arguments made to sustain these varying contentions it is necessary to sketch at some length the inter-corporate financial transactions which form the background of the controversy.

In 1916 petitioner owned all of the common stock of the corporation known as Kesbec Sales Company, Inc. The name of this corporation was subsequently changed to that of Caldec Sales Company, Inc., and for the sake of clarity will hereafter be referred to as Caldec. It began a retail gasoline business in 1916 and expanded its operations until in 1931 it operated fifty-five gasoline stations in and about New York city. In 1930 its capitalization was $50,000 of common stock and $1,800 of preferred stock. Petitioner owned all the common stock but none of the preferred. During the expansion of Caldec petitioner caused another corporation to be formed known as the Economy Oil Trucking Corporation, hereafter referred to as Economy. It was created for the purpose of conducting the trucking operations of Caldec which were incident to the latter's operation of the gasoline business, although also authorized to do an investment business. Its capitalization as of September 30, 1931, was $50,000 common stock and $12,800 preferred stock. Petitioner owned all of its common stock.

In 1921 petitioner organized another domestic corporation known as the Edlar Realty Corporation, referred to hereafter as Edlar. Edlar was created as a real estate holding company for the purpose of holding title to various locations where Caldec operated gasoline stations. Its capitalization in 1930 was $120,000 common stock and $176,000 preferred stock. Petitioner also owned all the common stock of this corporation.

Thus through the medium of these three corporations petitioner ultimately conducted a chain of fifty-five retail gasoline stations through the city of New York. Caldec operated the stations, Economy provided the trucking service and Edlar owned the real estate. This business became exceedingly valuable because most of the locations for gas stations were acquired and operating prior to the establishment of zoning regulations and restrictions in the city of New York. As a result petitioner received in 1930

offers of considerable magnitude for the purchase of the business. In 1931 negotiations for the sale were had with Colonial Beacon Oil Company, hereafter referred to as Colonial, a subsidiary of the Standard Oil Company of New Jersey. Petitioner personally conducted these negotiations which resulted in the arrangement that Colonial would buy all of the assets of Caldec, all the trucking equipment of Economy, and most of the real estate owned by Edlar. The net price was figured at approximately $4,800,000. Payment of one-fourth of this amount was to be deferred during such time as petitioner remained actively associated with the enterprise and he was to retain this one-fourth interest subject to an option to purchase given Colonial which might be exercised upon petitioner's death or disability.

This sale was to be carried through in the following manner: A new domestic corporation, known as Kesbec, Inc., was formed with a total capitalization of 4,800 shares of common stock. It should be noted that the capitalization of this stock at $1,000 a share equals the purchase price of $4,800,000 agreed to between petitioner and Colonial, and according to petitioner's admission the stock was worth this amount. Into Kesbec were to be gathered all the assets of Caldec, Economy and Edlar that Colonial desired to acquire. These transfers followed. The real estate held by Edlar was transferred to Kesbec, and Edlar received in exchange 2,770 shares of Kesbec having a value of $2,770,000. The physical assets of Caldec were transferred to Kesbec and Caldec received 2,030 shares of Kesbec having a value of $2,030,000. The trucking equipment owned by Economy was transferred to Kesbec for a cash consideration, necessarily so since all of the stock of Kesbec had been transferred to Edlar and Caldec. On the books of Edlar the 2,770 shares of Kesbec were given a value of $651,301.10, said to be cost value of the assets transferred by Edlar, although the actual value of the Kesbec shares received therefor was $2,770,000. In the same fashion Caldec entered upon its books the $2,030,000 worth of Kesbec stock it received at a value of $383,842.90, said to reflect the cost value of the physical assets transferred by Caldec. Thus the physical assets of Caldec and Edlar, having a cost value of $1,035,144 were transferred to Kesbec in exchange for stock of Kesbec having an actual value of $4,800,000. These same physical assets were set up in the books of Kesbec as having a value of $4,769,211.72, against which the 4,800 shares of stock, divided between Edlar and Caldec, were issued.

At this stage another corporation was formed with Canada as the background of its paternity. This was known as the Ell See Corporation of Canada, Ltd., hereafter referred to as Ell See, with

a capitalization of 3,600 shares of common stock. Its officers were Canadian attorneys who were paid no salary but received compensation in the form of legal fees, and who had no financial interest whatever in the company. No money was ever paid into this corporation except upon the formal execution of the contract with Colonial. Edlar, however, turned over 2,000 of its 2,770 shares of Kesbec to Ell See in exchange for 2,000 shares of Ell See stock. Caldec exchanged with Ell See 1,600 of its 2,030 shares of Kesbec in return for 1,600 shares of Ell See. These transactions placed three-fourths of the stock of Kesbec, that is, 3,600 shares out of the entire capital stock of 4,800 shares, in Ell See, and left one-fourth, or 1,200 shares, divided in ownership between Edlar and Caldec which petitioner owned and controlled. Thus the way was paved for the completion of the transaction with Colonial. Ell See owned the controlling interest in Kesbec, that is, 3,600 shares, and Kesbec owned all the physical assets which Colonial wished to purchase. There was left in Edlar and Caldec a one-fourth interest in Kesbec, and hence petitioner, who owned Edlar and Caldec, which in turn owned Ell See, retained the one-fourth interest which the arrangement with Colonial contemplated.

At this point Colonial was ready to do business with Ell See, and there followed the execution of a formal agreement between these entities on November 25, 1931. Colonial purchased of Ell See 3,600 shares of Kesbec and took an option to purchase the remaining 1,200 shares which were owned by Edlar and Caldec. This contract was guaranteed in all respects for Ell See by petitioner personally. The purchase price of the 3,600 shares of Kesbec by Colonial was conceded to have been $3,600,000 in round figures. Pursuant to the contract Colonial paid to Ell See 31,290 shares of Standard Oil of New Jersey and in addition a sum of money to make a total of $3,573,908.75.

Shortly after this transaction Economy returned to play a part in the structure of petitioner's financial affairs. As of September 30, 1931, according to its balance sheet, it had total assets of $111,402.96 and a surplus of $21,239.96. Before the end of 1931, however, it sold to Ell See its unsecured debentures to the amount of $1,505,000. Between 1931 and 1935 its sales in the aggregate to Ell See of its unsecured debentures had risen to the total amount of $3,110,000, and it received that amount of cash in return. The record indicates that the board of directors of Economy never authorized the issuance of these debentures. At about the time of the debenture transaction in 1931 petitioner received large amounts of cash from Economy. Between November 27, 1931, and December 29, 1931, inclusive, he drew a total of $1,615,000.

The amounts comprising this total were entered upon the books of the corporations as loans to him and treated as a running account although never authorized by the board of directors. At the end of 1931 petitioner executed and delivered his unsecured note to the corporation for $1,614,500, which represented the amount withdrawn for that year less a $500 payment. He paid interest on the alleged indebtedness at the rate of six per cent. During the years 1932 to 1935, inclusive, petitioner received large sums from Economy and the same practice was followed. Thus in 1931 he received $261,386.81 and repaid $51,000 of principal and interest on the unpaid balance. In 1932 he received $727,000 and repaid $10,000 of principal and interest on the debit balance. During 1934 he received $91,000, repaid $95,000 and paid interest on the debit balance. During 1935 he received $276,000, repaid $70,000 and paid interest on the remaining indebtedness. At the end of the year 1935 petitioner's alleged indebtedness to Economy was $2,743,886.81. In January, 1939, this amount had been reduced to $1,990,000.

Despite petitioner's claim that the amounts received from Economy by him were loans, the Commission has determined that these amounts were taxable distribution of earnings of Edlar and Caldec, earnings accumulated as the result of the transfer of their physical assets to Kesbec in return for stock far in excess of the value of such assets. These earnings became apparent in cash when Edlar and Caldec exchanged stock with Ell See, and the latter sold such stock to Colonial for $3,573,908.75. Of this amount $3,110,000 became available for withdrawal from Economy by petitioner after Economy had received this amount from Ell See in return for its debentures. On the basis of this finding that the amounts received by petitioner from Economy were a distribution of earnings the Commission has increased petitioner's taxable income for the years 1931 to 1935, inclusive, by, the amounts he received from Economy less any repayments he may have made, and disallowed any deductions for interest. Some errors are conceded by respondents in the amounts assessed for the years 1933 and 1934, but these errors are immaterial for the main purposes of this decision.

Whether the moneys received by petitioner from Economy were loans is a mixed question of law and fact. (*Billings* v. *Trask*, 30 Hun, 314.) The action of the Commission in the first instance is presumed to be correct, and upon petitioner rested the burden of proving that such advances were loans. By its affirmation of the additional assessments sought to be revised the decision of the Commission is to the contrary. If there are any facts to sustain

the decision so as to indicate that it was not arbitrary or capricious, we are required to confirm. (*People ex rel. Freeborn & Co., Inc., v. Graves,* 257 App. Div. 587.) . Respondents were not bound within the narrow confines of bookkeeping entries. (*People ex rel. Fox Film Corp. v. Loughman,* 259 N. Y. 30.) They had unquestionably the right and duty to consider substance as above form. (*Higgins v. Smith,* 308 U. S. 473; *Griffiths v. Commissioner,* Id. 355; *Helvering v. Gordon,* 87 F. [2d] 663.) The intricate manipulations which have been recounted, some of them apparently to no purpose unless to evade taxation, were not beyond consideration, and certainly entitled to some weight. The issuance of unsecured debentures by Economy, without a resolution of its directors, conditioned for the payment of sums far in excess of its assets, can scarcely be called an ordinary business practice. An inference may well be drawn from this transaction that its primary purpose was to draw into Economy the large profits realized upon the sale by Ell See to Colonial. Nor was the withdrawal by petitioner of large sums of money from Economy, upon no direction save his own demand, very cogent proof that he was dealing at arms length with a corporation. It is true that he gave a demand note at the end of each year, paid back part of the principal and also paid interest, but these facts are not necessarily conclusive on the issue of whether the amounts taken were *bona fide* loans. Who fixed the amounts, and determined the rate of interest? When were the alleged loans to be repaid, and how? Who was to enforce any demand as to their collection? The petitioner of course, and unless he acted of his own volition there is no certainty whatever that any action would ever be taken, or that the alleged loans would ever be repaid. Under such circumstances were respondents bound to accept petitioner's contention that the advances made were *bona fide* loans? We do not think so, and we cannot say that there are no facts or fair inferences to be drawn from the record to support the determination of the Commission.

The determination should be confirmed, with costs to respondents.

HILL, P. J., BLISS, HEFFERNAN and SCHENCK, JJ., concur.

Determination confirmed, with costs to respondents.